DALE SYSTEM, Inc. v. GENERAL TELE-RADIO, Inc. et al.

United States District Court,
S. D. New York.
June 25, 1952.

Louis Fieldman, New York City (Fleming James, Jr., Harry P. Lander, New Haven, Conn., of counsel), for plaintiff.

Cravath, Swaine & Moore, New York City (Harold R. Medina, Jr., New York City, of counsel), for defendants General Teleradio, Inc., Sitroux, Inc., Richard Kollmar, Dorothy Kilgallen, the Bon Ami Company, the Waffle Corp. of America, Bosco, Incorporated, Lewin, Williams and Saylor, Inc., Metropolitan Life Ins. Co., and Francis H. Leggett & Co.

MURPHY, District Judge.

This is a motion by ten of the defendants named herein, to dismiss the complaint for failure to state a claim upon which relief can be granted. The action for $50,000 damages and injunction arises from a broadcast on May 18, 1951 over Station WOR (General Teleradio, Inc.) by defendants Richard Kollmar and Dorothy Kilgallen on their program "Dorothy and Dick". The remaining defendants, other than the Reader's Digest Association, Incorporated, are alleged to have been sponsors of that program.

During that broadcast certain statements were read from the then current issue of Life magazine from an article concerning the Willmark Services System, Inc., a company engaged in checking efficiency and honesty of employees of retail establishlishments by shopping at such establishments and ascertaining the manner in which sales were conducted. Plaintiff complains of two statements read from Life, namely:

(1) "Willmark * * * is the only company of its kind"; and

(2) "They paid a great compliment to Willmark during the war. The Government gave Willmark—furnished their shoppers with ration stamps so that test purchases could continue right through the war."

Plaintiff states that it is a competitor of Willmark's, doing business in certain eastern States, and that it has been injured by these statements because their meaning is "that there was no such concern as plaintiff, that plaintiff was not in the same line of business, that plaintiff was incompetent, inconsequential and not worthy of mention and that the United States Government had recognized Willmark's essentiality during the war, but had not recognized plaintiff's and had complimented Willmark but had not so complimented the plaintiff."

The basis for relief against defendants is that they "should in the exercise of reasonable care have known that the defamatory statements set forth in * * * this complaint were false and untrue." There is no allegation in the complaint of special damage to plaintiff resulting from the broadcast. In addition to damages and injunction plaintiff asks that copies of the broadcast in question be impounded and destroyed as well as costs, counsel fees and other relief as may be equitable.

The first question, that of choice of governing law, is posed by plaintiff's allegation that the broadcast was "heard by listeners to station WOR and affiliated stations from Maine to North Carolina and as far west as Harrisburg, Pennsylvania and elsewhere, including the territory in which plaintiff and Willmark are in competition." It is true that a tort controversy does not present a choice of law problem unless both (1) it is significantly related to more than one jurisdiction; and (2) its determination on the merits varies according to which related jurisdiction supplies the governing internal substantive law. Concededly the first requirement is met by the instant case but the second, whether internal law of related jurisdictions is significantly different, must remain conjectural unless thorough canvass is made of the internal rules of all states within broadcast range. We think that part of the of-

fice of conflict-of-laws is to obviate such investigation by making available rules for choice of governing law in controversies with important contacts overflowing the boundaries of a single state. The problem at the outset then is to · select the appropriate choice of law rule—a troublesome question so far as torts involving publication are concerned.

Professor Ludwig has thus evaluated several possible rules in multi-state publication situations, "Peace of Mind" in 48 Pieces v. Uniform Right of Privacy, 32 Minn.L.Rev. 734, 760–62 (1948):

"Consideration of several proposed solutions indicates why courts and counsel have happily ignored the problem in almost all of the cases:

"(1) *Substantive law of forum.* Since the court in which the action is brought can more easily determine its own substantive law than it can ascertain that of another jurisdiction, it might appear convenient for the forum always to provide the governing law in multi-state cases. But the forum is not invariably the jurisdiction most significantly connected with the controversy, and to make the outcome vary with the forum violates this basic tenet of conflicts. Since jurisdiction over defendants responsible for nationwide communications may be had in almost any state, the plaintiff could 'shop around' for the most favorable substantive rule and most liberal damages.

"(2) *Place of last event.* At least one case has applied the *Restatement* choice-of-law rule that the governing law is to be supplied by the place where the 'last event' takes place which is 'necessary to make an actor liable.' In privacy [and libel and slander] situations, this is the place where publication occurs. In radio and television, transmission is both simultaneous and multi-jurisdictional, and determination of the place of first impact would require the atomic accuracy of the physicist.

"(3) *Point of origination.* The place of the act has often been suggested as the state to provide the governing law. This would give publishing and broadcasting defendants opportunity to select a favorable jurisdiction for operations. What is the point of origin for periodicals which are edited in one state and printed in another, or those printed and shipped from two states?

"(4) *State of principal circulation.* Some have suggested that governing law should be provided by the state of principal circulation. This rule would amount, in effect, to the adoption of the New York substantive law. * * *

"(5) *Domicil of the plaintiff.* The domicil of the plaintiff might offer suitable governing law. Disturbance to a person's peace of mind probably has its most significant contact there. However, the rule breaks down for individuals with multiple domicils. Plaintiffs of national prominence might suffer more * * * elsewhere than at home. For publishers and broadcasters this rule would spell chaos and no predictable standard of conduct would be provided.

"These proposals for a choice of law principle, all pointing to substantive rules of a single state, are inadequate. A conflicts principle designating the rules of the plurality of states in which circulation occurred would only add to confusion. * * *"

Since jurisdiction in this case rests upon diverse citizenship, this Court must resolve the problem of choice of law in accordance with the conflict-of-law principles of the State in which it sits. Erie Ry. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188; Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. New York courts have applied the Restatement choice of law rule to torts generally and accordingly have selected as governing law that of "the state where the last event necessary to make an actor liable" took place. Restatement, Conflict of Laws § 377 (1934); cases collected in Mattox v. News Syndicate Co., 2 Cir.,

176 F.2d 897, footnote 1 at page 900, 12 A. L.R.2d 988. But as to libel communicated in several jurisdictions, while the Restatement, Conflict of Laws § 377(5) suggests "the place of communication" as supplying governing law, the New York decisions have not authoritatively indicated which state is the place of communication. See Mattox v. News Syndicate Co., supra, 176 F.2d at page 900. The Mattox case explicitly left this question unanswered since it appeared in that case that the plaintiff suffered damage in but a single state. Id. Under the particular circumstances of this case and only so far as resolution of the question whether the complaint states a claim upon which relief can be granted requires choice of the internal law of one state, we think that New York should supply that governing law. A grouping of the dominant contacts in this case points to the internal law of New York. Of the five suggested solutions mentioned by Professor Ludwig supra, three unequivocally suggest this result in this case: New York is not only the state of the forum but also the point of origination of the broadcast and state of principal circulation. To a considerable extent the other two points of reference also indicate New York: it is not at all improbable that the broadcast was first heard in that state and while the technical domicil of the corporate plaintiff is alleged to be in Connecticut, it is also alleged that the corporation is doing business in New York.

The second question is whether the complaint states a claim upon which relief can be granted on any conceivable basis. We shall consider the possible grounds in the following order:

█ (1) *Intentional Infliction of Harm.* In New York, the prima facie theory of tort liability has been recognized to make actionable an omission on a radio broadcast made with intent to injure. Advance Music Corp. v. American Tobacco Co., 296 N.Y. 79, 70 N.E.2d 401, 402. In that case a complaint was held sufficient to state a cause of action when it alleged that defendant's radio program boasted that its "hit parade" consisted of a number of the most popular songs of the week " 'based upon an

extensive and accurate survey conducted 'throughout the nation' " but omitted popular songs published by plaintiff " 'with intent to injure the plaintiff.' " While this complaint states "defendants falsely and maliciously published of and concerning the plaintiff", plaintiff's counsel has conceded in oral argument that this does not signify an intentional omission of plaintiff. Nowhere does the complaint allege that the omission occurred with intent to injure the plaintiff. Indeed, it states that "defendants should in the exercise of reasonable care have known that the defamatory statements set forth * * * were false and untrue." Naturally there is a vast difference between on one hand alleging the "malicious", i. e., intentional, publication of a false statement, as opposed to a *lapsus linguae,* and on the other alleging an intentional publication *for the sake of* injuring the plaintiff.

█ (2) *Negligent Use of Words.* Since the decision of the House of Lords in Derry v. Peek, 14 A.C. 337, 58 L.J.Ch. 864, limited the action of deceit to cases where "a false representation has been made (1) knowingly, or (2) without belief in its truth, or (3) recklessly, careless whether it be true or false," id., per Lord Herschell, 14 A.C. 374, recovery for negligent use of words must rest on some other basis. Kountze v. Kennedy, 147 N.Y. 124, 41 N.E. 414, 29 L.R.A. 360. The misrepresentations involved in this case are not alleged to have been made either knowingly, without belief in their truth, or recklessly. One important difference between actions for misrepresentation in deceit and those based upon negligence is that the class of persons to whom the defendant may be liable is considerably more restricted when the basis of liability is negligence rather than intent or recklessness. Accordingly, in the celebrated case of Ultramares Corporation v. Touche, 255 N.Y. 170, 174 N.E. 441, 74 A.L.R. 1139, no liability based upon negligence was found for accountants who carelessly certified a corporation's balance sheet fully expecting that it would be used generally for credit purposes by the corporation but without knowledge that the particular plaintiff would rely upon it in mak-

ing a loan to the corporation. "[I]f there has been neither reckless misstatement nor insincere profession of an opinion, but only honest blunder, the ensuing liability for negligence is one that is bounded by the contract, and is to be enforced between the parties by whom the contract has been made." Id., 255 N.Y. at page 189, 174 N.E. at page 448. On the other hand, when there is privity of contract or a relationship giving rise to a duty to inform correctly, if one speaks at all, liability for misrepresentation based upon negligence has been recognized. A bailee who negligently informs his bailor where the latter's goods are stored, knowing that inquiry is made for insurance purposes, is liable for the resulting loss. International Products Co. v. Erie R. Co., 244 N.Y. 331, 155 N.E. 662, 56 A.L.R. 1377. A public weigher employed by a seller of goods is liable for erroneous report of their weight knowing the buyer's reliance on it "was the end and aim of the transaction." Glanzer v. Shepard, 233 N.Y. 236, 135 N.E. 275, 23 A.L.R. 1425. So, also, is a physician who recommends a surgeon as competent and skillful knowing the contrary to be the case. Cestone v. Harkavy, 243 App.Div. 732, 277 N.Y.S. 438 (2d Dept. 1935). The information supplied by the defendants in these cases was done so for a stated purpose, with knowledge that it would be acted upon to plaintiff's injury if false and the relationship between the parties was such that the plaintiff normally would rely on the defendant for the information. But the scope of the duty falls short of foreseeability of possible harm to any one in a group of persons. However wavering the line between negligent language that gives rise to liability and that which does not, it is clear that the relationship between the broadcasting defendants and the unmentioned plaintiff is not one encompassed by any recognized legal duty.

▐ (3) *Libel and Slander.* Plaintiff has alleged that the statements omitting it were "defamatory" ones, suggesting a possible cause of action in libel or slander. It is not necessary to delineate the historic and often indefensible distinctions between libel and slander, or determine whether this complaint states a cause of action in one rather than the other. It is sufficient to point out that a corporation, while having no reputation in a personal sense, does have prestige and position in the business in which it is engaged which are capable of being damaged by aspersive language. Reporters' Ass'n of America v. Sun Printing & Publishing Ass'n, 186 N.Y. 437, 79 N.E. 710. But special damage must be alleged unless "the language is of so defamatory a nature as to directly affect credit and to occasion pecuniary injury." Id., 186 N.Y. at page 440–41, 79 N.E. at page 711. See also Kemble & Mills of Pittsburgh v. Kaighn, 131 App.Div. 63, 115 N.Y.S. 809 (1st Dept. 1909). The instant complaint lacks such allegation. The question then is whether the statements, "Willmark * * * is the only company of its kind. * * * They paid a great compliment to Willmark during the war. * * *", are defamatory on their face of an unnamed company, the plaintiff.

Considerable assumption must be entertained before these statements may be made to mean what plaintiff alleges they signify, viz., that plaintiff does not exist. To say that "X is the only company of its kind" may mean no more than that X is in a class by itself. So far as an unmentioned competitor Y is concerned, it may mean simply that Y possesses only some but not all of X's principal attributes and hence Y is not a "company of its kind." The exaltation of one is not the extinction of another. But even if the statements are susceptible of the interpretation of the non-existence of plaintiff, the statements by themselves without allegation of facts extrinsic to them showing plaintiff was a "company of its kind," could not give the plaintiff a cause of action without averment of special damage. O'Connell v. Press Publishing Co., 214 N.Y. 352, 108 N.E. 556; Kuhn v. Veloz, 252 App.Div. 515, 299 N.Y.S. 924 (1st Dept. 1937). The complaint then does not conform to the technical dimensions of libel or slander.

▐ (4) *Some Penumbral Competitive Tort.* In a somewhat more anomalous area of unfair competition, numerous causes of action involving interference with

economic relations by use of language have been recognized since the Seventeenth Century under such names as disparagement, trade libel, slander of goods and injurious falsehood. These cases have come to embrace first aspersions on title to land and later on other property, and then on the quality of property or goods. Plaintiff thus relies upon Davis v. New England Railway Pub. Co., 203 Mass. 470, 89 N.E. 565, 25 L.R.A.,N.S., 1024, in which a demurrer to a bill in equity was overruled. The bill alleged omission of plaintiff's name from what purported to be a complete list of expressmen published by defendant and that the omission resulted from false statements and threats of injury to defendant's business by two of plaintiff's competitors. The bill stated that "the plaintiff has requested the defendant corporation to include in the list of general express offices and telephone numbers [its] location * * * and the number of [its] telephone * * *. The defendant corporation has refused * * *."; also that "[two competitors of plaintiff] have conspired together to induce the defendant corporation to exclude such reference to the plaintiff and his subtenants in said publication, and, in pursuance of such conspiracy, have induced the defendant to refuse to make any such reference; that they have induced the defendant so to refuse partly by stating to the defendant corporation that the business of the plaintiff or his subtenants is not conducted in a proper and reliable manner, all of which statements are wholly false and without warrant in fact; and partly by threatening, in case the corporation does not so refuse, that they will not longer cooperate with the defendant corporation in furnishing data for such publication, and that they will diminish the advertising obtainable by such publication, and that they will in other manners injure the business of the defendant corporation; * * *"; also that "If the defendant corporation is permitted hereafter to issue said publication in the form intended, it will work an injury to the plaintiff irreparable * * *." Id., 203 Mass. at pages 473, 474, 475, 89 N.E. at page 565. The instant complaint is far from alleging even an advertent omission of plain-

tiff in defendants' publication. "Since in every case the plaintiff must prove special damage, in the form of loss of a present or prospective economic advantage," Prosser on Torts § 106, p. 1038, it would seem that this deficiency in the complaint also distinguishes it from actionable ones.

We are asked by plaintiff to dispense with the almost impossible burden of proof of special damage and sustain this complaint notwithstanding the absence of a reported case in point. Defendants, for their part, warn that such a result would lay the courts open to a flood of litigation. It may be that the requirement of special damage often leaves a serious wrong without remedy. But we do not think these considerations can be determinative. On one hand, the absence of judicial determination that such cause of action exists in the face of an astronomical number of publications throughout centuries in the course of the common law is hardly without significance in deciding whether there is such a right. On the other, the threat of inundation of litigation often made in the past in the case of peripheral causes of action, has with equal frequency failed to materialize in the wake of judicial recognition of such rights. Cf. Roberson v. Rochester Folding Box Co, 171 N.Y. 538, 64 N.E. 442, 59 L.R.A. 478 *with* N.Y.Civil Rights Law McK. Consol.Laws, c. 6, §§ 50, 51. Other more significant considerations of social desirability underlie the extension of liability beyond decided cases in this situation. One is the important demarcation between intentional and negligent infliction of harm. The other, a counter consideration to the extension of liability for defamation among broadcasters, is the great social interest in unhampered public discussion. Unlike other areas in the law of torts, increasing broadcasting risks may tend to restrict public discussion since the "owner * * * is not likely to share the eagerness of Socrates to speak the truth even if he must die. The balance-sheet becomes a more important document than the editorial page, and it seems wiser to keep them both out of the red. Therefore, the old hatred of censorship appears to be weakening. In several of the concrete situations * * * the busi-

nesses concerned are acquiescing in a systematic weeding-out before the material is offered to the eyes and ears of the public. Whether this previous restraint be performed * * * by a particular purveyor as in radio broadcasting stations, the loss to open discussion is much the same." Chaffee, Free Speech in the United States (1941) 521, quoted in Shulman and James, Cases and Materials on Torts (1942) 1006. Such crucial considerations of social policy are better adapted to resolution in a legislative forum where voices of the many interests affected may be heard than a judicial one where but a few are involved. And least appropriate of judicial forums in staking out new claims in the substantive law of torts is a Federal one where constitutional considerations require national deference to State ascendancy in this area.

Motion to dismiss granted.