## NEIMAN–MARCUS CO. et al. v. LAIT et al.

United States District Court
S. D. New York.
Aug. 19, 1952.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Arnold, Fortas & Porter, Washington, D. C., for plaintiffs.

Hyman I. Fischbach, New York City (Vincent. J. Crowe, New York City, of counsel), for defendants Lait and Mortimer.

MURPHY, District Judge.

These are motions by defendants Lait and Mortimer to dismiss a complaint purporting to allege a cause of action in libel on the ground that it fails to state a claim upon which relief can be granted, and to strike certain paragraphs therefrom. The defendants, at this stage of the proceedings, are authors of a certain book, the complaint having been dismissed on motion by plaintiffs with respect to the printing and publishing defendants.

The complaint alleges that certain matter, set forth in the margin,[1] was published

1. "Pages 39–40:
"The telephone had come into its own. Whores are 'call girls,' 'party girls' or 'company girls.' Instead of your visiting

them, they come to see you.
"This resulted in a complete change in the economic set-up of the oldest profession. Since houses are not needed,

of and concerning the plaintiffs and each of them, and is libelous. Plaintiffs consist of a corporation, Neiman-Marcus Company, named in the book, and three groups of its individual employees, not so named but allegedly referred to in the book, listed in the complaint as follows:

(1) Nine individuals "each of whom is a model employed by Neiman-Marcus for the purpose of modeling or displaying clothes to prospective customers" and who "constitute the entire group of such models regularly employed by Neiman-Marcus" [Complaint, par. 3, 16]:

(2) Fifteen individuals "each of whom is a salesman employed for the purpose of serving prospective customers in the Neiman-Marcus men's store" and each of whom brings this suit "in his own behalf and, pursuant to Rule 23(a)(3) of the Federal Rules of Civil Procedure (28 U.S.C.), on behalf of all other salesmen employed by Neiman-Marcus in its men's store who care to join and participate in this action" [Complaint, par. 4, 12]; and

(3) Thirty individuals, "each of whom is a saleswoman employed by Neiman-Marcus for the purpose of serving customers in the various departments of the store" and each of whom, as in the case of the fifteen salesmen, bring this action on behalf of all other saleswomen [Complaint, par. 5, 13].

The complaint does not allege the number of models who were employed by the corporate plaintiff, other than those "who constitute the entire group of such models regularly employed" nor the number of its salesmen or saleswomen, either regularly or otherwise employed, but states that the corporate plaintiff "employs more than 1200 people" [Complaint, par. 14].

All of the plaintiffs are alleged to be citizens of Texas and the defendants, citizens of New York. The matter in controversy is alleged to exceed for each of the plaintiffs, exclusive of interest and costs, the sum of $3,000. The corporate plaintiff seeks $2,000,000 and the other ones $100,000 each, in compensatory and punitive damages, together with costs.

The complaint, filed in this Court on April 14, 1952, alleges that the book in question "was offered for sale by defend-

---

neither are large investments. Without houses immovably located, pay-offs to bluecoats on the beat have become almost extinct and so, for that matter, have raids. Only the lowest street-walkers are collared. Meanwhile, the price is up; the old 50-cent house girl is insulted with $10 for a quick visit to your hotel room. The younger, fresher and smarter talent asks $100 and frequently gets it.

\* \* \* \* \* \*

"Some people call them call girls and others refer to them as party girls; because you call them when you want a party.

"Page 196:

"He [Stanley Marcus, president of plaintiff Neiman-Marcus Company] may not know that some Neiman models are call girls—the top babes in town. The guy who escorts one feels in the same league with the playboys who took out Ziegfeld's glorified. Price, a hundred bucks a night.

"The sales girls are good, too—pretty, and often much cheaper—twenty bucks on the average. They're more fun, too, not as snooty as the models. We got this confidential, from a Dallas wolf.

"Neiman-Marcus also contributes to the improvement of the local breed when it imports New York models to make a flash at style shows. These girls are the cream of the crop. Oil millionaires toss around thousand-dollar bills for a chance to take them out.

"Neiman's was a women's specialty shop until the old biddies who patronized it decided their husbands should get class, too. So Neiman's put in a men's store. Well, you should see what happened. You wonder how all the faggots got to the wild and wooly. You thought those with talent ended up in New York and Hollywood and the plodders got government jobs in Washington. Then you learn the nucleus of the Dallas fairy colony is composed of many Neiman dress and millinery designers, imported from New York and Paris, who sent for their boy friends when the men's store expanded. Now most of the sales staff are fairies, too.

"Page 208:

"Houston is faced with a serious homosexual problem. It is not as evident as Dallas', because there are no expensive imported faggots in town like those in the Neiman-Marcus set."

ants Crown Publishers, Inc. throughout the United States commencing on or about March 4, 1952" [Complaint, par. 19].

Two principal questions are presented by these motions, whether or not: [I] the individual plaintiffs have failed to state a claim upon which relief can be granted; and [II] the corporate plaintiff has so failed. We shall consider these questions in that order.

· I.

The first question turns upon whether the individual plaintiffs are ascertainable or capable of identification from the words complained of so as to state a claim upon which relief can be granted. At the outset a preliminary question of choice of governing law is posed, provided (1) this question of identifiable reference to the plaintiffs may properly be deemed one of the substantive law of libel and not a procedural one within the province of Federal Court law; (2) the controversy is significantly related to more than a single jurisdiction; and (3) resolution of the question on ·its merits will vary according to which related jurisdiction supplies ˙the governing internal substantive law.

The nature of the question presented and the allegation in the complaint that "the book was offered for sale * * * throughout the United States", make clear that the question is one of substantive law and relates to more than a single jurisdiction. It also appears that determination of this question may vary according to which jurisdiction is selected to supply governing law. A libellous imputation directed against a group of persons designated by collective description alone was early held at common law to enable a member of the group to maintain a suit. Foxcroft v. Lacy, Hobart 89a (1613); Hughes v. Winter, 2 Barn.K.B. 267 (1733). But a contrary doctrine, that absent specification. of a particular person ˙no cause ·of action would lie, was early established in New York, Sumner v. Buel, 1815, 12 Johns. 475, and has been followed elsewhere. Comes v. Cruce, 85 Ark. 79, 107 S.W. 185; Watson v. Detroit Journal Co., 143 Mich. 430, 107 N.W. 81, 5 L.R.A.,N.S., 480; note 34 Col.L.Rev. 1322 (1934). This doctrine, not

expressly repudiated, has been qualified and distinguished, but the extent to which it is accepted.depends largely upon the jurisdiction. Thus, for example, a complaint was dismissed in one jurisdiction when the libellous article referred to a "number of persons * * * including part-time doctors" at a named institution as having a contagious disease, and the plaintiff was one of four part-time doctors at such institution. Kassowitz v. Sentinel Co., 226 Wis. 468, 277 N.W. 177. Yet, in another jurisdiction, a demurrer to a complaint was overruled where the libellous article charged that graft pervaded "the entire office" of the coroner of a named borough, but that "most of the graft goes, not to the underlings, but to those higher up" and plaintiff was one of four physicians in the coroner's office. Weston v. Commercial Advertiser Ass'n, 184 N.Y. 479, 77 N.E. 660. Assuming the sufficiency of a complaint involving general derogatory reference to a group depends upon the intensity of the suspicion cast upon the individual plaintiff, .the extent of the shadow cast is measured differently depending upon jurisdiction.

 Since jurisdiction in this case rests upon diverse citizenship, this Court ordinarily would resolve the problem of choice of law in accordance with the conflict-of-law principles of the State in which it sits. Erie Ry. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188; Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. New York courts have applied the Restatement choice of law rule for torts generally and accordingly have selected as governing law that of "the state where the last event necessary to make an actor liable" took place. Restatement, Conflict of Laws, § 377 (1934); cases collected in Mattox v. News Syndicate Co., 2 Cir., 176 F.2d 897, footnote 1 at page 900, 12 A.L.R.2d 988. But as to libel communicated in several jurisdictions, while the Restatement, Conflict of Laws, § 377(5) suggests "the place of communication" as supplying governing law, the New York decisions have not authoritatively indicated which state is the place of communication. This court has already

selected New York as the state providing governing law in a multi-state publication situation on the basis of a grouping of dominant contacts, where New York was the state of the forum as well as the state of origination of the publication and the one of its principal circulation, and probably also the state of initial publication and one where the corporate plaintiff was doing business, although technically domiciled elsewhere. Dale System v. General Tele-Radio, Inc., D.C., 105 F.Supp. 745. In the instant case, there is no allegation in the complaint concerning the point of origination or state of first publication of the book in question. In addition, all of the named individual plaintiffs are alleged to be citizens of Texas, and are not presumably persons of national prominence who might suffer damage elsewhere. There is authority that the measure of damage, aside from the question of liability, in multi-state libel may lawfully be determined according to the internal law of the state of domicil of the individual plaintiff. Mattox v. News Syndicate Co., supra, 176 F.2d 897. But we do not deem it necessary, because other considerations are controlling, to select as governing law the internal rule of a single related jurisdiction on the controversial question of identifiable imputation to plaintiffs presented by their complaint.

These other considerations are not affected by variations in internal law of related jurisdictions, so far as we can determine, and so may be disposed of without first surmounting the hurdle of choice of law. One such consideration is the conspicuous omission from the complaint of the usual language of pleading which would place the individual plaintiffs in the libelled group *at the time* the cause of action is alleged to have arisen. The complaint was filed on April 14, 1952. The cause of action is alleged to have arisen when the book in question "was offered for sale * * * commencing on or about March 4, 1952." The language describing each group of plaintiffs is the same. After naming them, the complaint states "each of whom *is* a model employed by Neiman-Marcus" and "each of whom *is* a salesman" and "each of whom *is* a saleswoman." Absent are any phrases

suggesting that any of the plaintiffs *were* members of the group at the time the cause of action is alleged to have arisen. Between March 4 and April 14, it is far short of speculation to assert that a department store, alleged to employ "more than 1200 people", hired nine models, fifteen salesmen and thirty saleswomen. If such was the case, and if persons employed subsequent to the date on which this cause of action is alleged to have arisen, are the individual plaintiffs in this action, then these classes of plaintiffs might well be so elastically ill-defined, that they could not maintain this action. "The books are full of cases illustrating the principle upon which the pleader has gone in framing the count: such as, 'The parson of Dale is a thief', where it was holden that he who was parson at the time the words were spoken might maintain the action. 3 Bulst. 326." Croswell v. Weed, 25 Wend. (N.Y.) 621, 624. To hold otherwise would be to confer on each person hereafter employed in the categories of models, salesmen and saleswomen in the department store in question, a one-hundred-thousand-dollar interest in a law suit the moment that such person assumed exhibiting or selling duties, a consequence this court need not pass upon.

■■ The complaint then fails to indicate membership in the libelled groups of the individual plaintiffs named at the time the cause of action is alleged to have arisen. It also fails to disclose the numerical size of these groups at such time. Whatever the rule in jurisdictions related to this controversy on the question of group defamation, the size of the class involved has always been material in determining whether or not a cause of action lies for individual plaintiffs.

Accordingly, the complaint is dismissed with respect to the individual plaintiffs, with leave to amend.

II.

■ The second question is whether or not the corporate plaintiff has stated a claim upon which relief can be granted. It seems clear that a corporation, while having no reputation in a personal sense, does have prestige and position in the busi-

ness in which it is engaged which are capable of being damaged by aspersive language. Special damage must be alleged unless "the language is of so defamatory a nature as to directly affect credit and to occasion pecuniary injury." Reporters' Ass'n of America v. Sun Printing & Publishing Ass'n, 186 N.Y. 437, at pages 440–441, 79 N.E. 710, at page 711. See also Restatement of Torts, § 561(1). There is no indication from the reported cases on the question of whether or not a corporation has a cause of action for aspersive language against its employees, that their determination varies with jurisdiction, and so it is not necessary to resolve any problem of choice of law on this question.

█ A corporation may be defamed by words directed at its employees if they are such as to discredit the method by which its business is conducted. Axton-Fisher Tobacco Co. v. Evening Post Co., 169 Ky. 64, 183 S.W. 269 at page 277, L.R.A.1916E, 667. Without necessity for approving the ethnic implications of the court's decision in that case, it cannot be said as a matter of law that a corporation cannot be damaged in a business way by a publication that it employs seriously undesirable personnel. If, of course, the corporate plaintiff chooses to interpret the words as "related to the officers of the corporation and not to the corporation itself", or as "published solely of and concerning its officers", a different situation is presented Hapgoods v. Crawford, 125 App.Div. 856, 110 N.Y.S. 122, at page 123. And so we consider the question of whether or not the corporate plaintiff in the instant case was prejudiced in the conduct of its business by a publication that certain classes of its employees, or portions of them, are prostitutes or homosexuals, to be one of fact for a jury. Similarly, the question of whether or not the corporation is directly accused of importing and hiring such undesirable persons, in the context in which such statements appear, is deemed one of fact. This disposition is made especially compelling by the consideration that the only nominal identification of the groups of persons in question is effectuated by reference to their employment status with the named corporate plaintiff.

█ █ In addition, for purposes of this motion to dismiss, the allegations in the complaint must be accepted as true. The nature of the corporate plaintiff's business and the injury to it resulting from defendants' publication, are set forth in detail.[2]

2. "Neiman-Marcus, which has the reputation of being one of the leading and most fashionable stores in the United States, does a gross business annually of $24,000,000 and employs more than 1200 people. It annually expends large sums of money in maintaining its position and reputation in the community and nationally and has spent millions of dollars in building up and zealously maintaining its good will. It advertises nationally in select quality publications and its clientele is drawn from all over the United States and many foreign countries and includes persons who are the most prominent and most respected citizens in their communities. The success of plaintiff's department stores depends not only on the quality and variety of merchandise which it offers for sale, but also upon its reputation for operating exclusive stores of flawless taste and on the personal reputation and skill of its models, salespeople and other employees. Because of the nature and character of Neiman-Marcus' Stores, the relationship between its clientele and personnel is a very personal one and to an unusual degree its good will and business are dependent upon the trust and confidence which its customers repose in the character and reputation of the personnel of the stores and in the reputation and good taste of the stores themselves. [Par. 14].

"Plaintiff Neiman-Marcus has been injured by the false and defamatory publication by defendants that it has in its employ models and salesgirls who are engaged in the business or occupation of prostitution, and salesmen and millinery and dress designers who are engaged in immoral and unlawful acts in that it has held plaintiff up to public contempt and ridicule and in that it has charged Neiman-Marcus with participation in illegal and immoral acts. As a result prospective customers have been deterred from doing business with plaintiff Neiman-Marcus for fear of coming in contact with immoral, unchaste and indecent personnel, and the good will of plaintiff Neiman-Marcus has been impaired. Plain-

Apart from the consideration whether the language in question is so defamatory as to directly prejudice the corporate plaintiff in the conduct of its business, the complaint may well be considered as alleging special damage.

After the motion papers and briefs were filed, I discovered for the first time that the book in question, a copy of which autographed by the authors had been previously mailed to me, contained several statements mentioning me by name. Title 28 U.S.C.A. § 455 provides:

"Any justice or judge of the United States shall disqualify himself in any case in which he has a substantial interest * · * * (so) as to render it improper, in his opinion, for him to sit on the trial, appeal, or other proceeding therein."

The Reviser's Notes indicate that the foregoing is based on old Title 28, Section 24. The note says:

"The phrase 'in which he has a substantial interest' was substituted for 'concerned in interest in any suit.'"

I do not consider these statements, whether laudatory or otherwise, as providing me with "a substantial interest" so as to render "improper" in my opinion my determination of these motions. However, I have notified both attorneys of these facts. By letter, they have stated their preference that I, rather than some other judge, dispose of these motions. Accordingly, I construe this as a waiver of any possible statutory objection.

The complaint is dismissed insofar as it relates to the individual plaintiffs, with leave to amend.

Motion to dismiss complaint with respect to corporate plaintiff is denied.

Settle order.

tiff Neiman-Marcus has suffered because of the lowered morale of its personnel due to the libelous statements published by the defendants and has found it difficult to recruit personnel of high calibre and reputation of the type necessary for the successful conduct of a business of the standing of Neiman-Marcus, and has incurred great expense to overcome the adverse publicity and the demoralizing effect created by defendants' defamatory and false publication." [Par. 23.]