WATSON *v.* DETROIT JOURNAL CO.

1. LIBEL—DECLARATION—INDUCEMENT—INNUENDO—NECESSITY.

A declaration for libel by a trading stamp concern against a newspaper publisher alleged the publication as follows "Two suits [meaning the suits brought by this plaintiff and other stamp company in this court] brought by trading stamp concerns [meaning as one of these this plaintiff, etc.] call attention to the fact that these get-rich quick schemes are outlawed in this city." *Held,* that an averment, by way of inducement, that plaintiff was one of the parties bringing suit, to which the innuendo could be referred to determine its truth, was necessary.

2. SAME — PUBLICATION — CONSTRUCTION OF LANGUAGE — REFER-
ENCE TO A CLASS.

A class of persons being engaged in the conduct of trading
stamp concerns in a city, a publication which does not refer to
all of the persons, but referred generally to the trading stamp
concerns of the city, as "the get-rich-quick industry," "the
trading stamp fake," etc., is not libelous.

Error to Wayne; Donovan, J. Submitted February 1,
1906. (Docket No. 83.) Decided March 27, 1906.

Case by Harry W. Watson and others against the De-
troit Journal Company for libel. There was judgment
for defendant on demurrer, and plaintiffs bring error.
Affirmed.

*Corliss, Leete & Joslyn (Ray B. Morgan,* of counsel),
for appellants.

*Geer, Williams & Martin,* for appellee.

MOORE, J. This action was commenced by declaration,
to which a demurrer was interposed. The demurrer was
sustained, and the case is brought here for review. The
declaration contains several counts. If a cause of action
is stated therein, it is in the following:

"COUNTY OF WAYNE—SS.:

"And now come Harry W. Watson, William C. Or-
rell, William Wildanger, Frank D. Buckingham, and
George A. Cothraine, of Flint, Michigan, copartners, doing
business as the Michigan Trading Stamp Company, plain-
tiffs, and complain of the Detroit Journal Company, a
Michigan corporation, the defendant herein, in a plea of
trespass on the case, filing this as their amended declara-
tion:

"For that whereas, heretofore, to wit, on the 20th day of
September, 1904, and for a long time prior thereto, to wit,
for a period of one year, and until the present time, the
said plaintiffs, under the firm name as aforesaid, have
been engaged at Detroit, Michigan, and at other cities in
the State of Michigan, in the business of selling trading
stamps, or coupons, to the merchants of the city of De-
troit and of other cities and towns in the State of Michi-
gan, and in redeeming such of said stamps as are present-

ed for that purpose at the stores of these plaintiffs, which redemption is made by exchanging for such trading stamps articles of merchandise, a large stock of which is and has been kept at the stores of the said plaintiffs; that by the carrying on of said business the said plaintiffs had built up and established a large and profitable business and had invested in said business large sums of money, to wit, the sum of fifty thousand dollars, and that prior to the acts herein complained of the said plaintiffs had derived large profits from said business, to wit, at the rate of ten thousand dollars per year; that the said plaintiffs always were and are good and honest citizens of this State, and before and at the time of committing by the said defendant the grievances hereinafter mentioned were persons of good name, credit, and reputation, and the said business carried on by them under the firm name as aforesaid was and is a fair, honest, and lawful business; that, at the time and places aforesaid, the said defendant was engaged in printing and publishing, and was the proprietor and owner of a daily newspaper known as the 'Detroit Journal,' which said paper at the times herein mentioned had a large circulation in the city of Detroit and throughout the State of Michigan. Yet the said defendant, well knowing the premises, but contriving and maliciously intending to injure said plaintiffs in their said business, and to bring them, the said plaintiffs, into public scandal and disgrace, and to bring the business carried on by these plaintiffs as the Michigan Trading Stamp Company into disrepute, and to injure and destroy the said business of these plaintiffs, did, to wit, on the 20th day of September, 1904, at the city of Detroit, Michigan, and in other cities and towns in the State of Michigan, wrongfully injuriously and maliciously publish a certain false, injurious and malicious libel of and concerning the said plaintiffs in their said business, to wit, an editorial in the said Detroit Journal as follows:

### "'THE OUTLAWED TRADING STAMP.

"'Two suits [meaning the suits brought against the city of Detroit et al. by these plaintiffs and International Amusement Stamp Company of Detroit, Michigan, Limited, in this court], brought by trading stamp concerns [meaning as one of these, these plaintiffs doing business as the Michigan Trading Stamp Company, who had brought one of said "two suits"], call attention in emphatic manner to the fact that this particular form of the get-rich-quick industry is now outlawed in this city. The people of the entire com-

munity through their legislative representatives have voted almost unanimously to place them on the same basis as lotteries and resorts of a socially disreputable character.

"'The passage by the people of the municipal ordinance including the trading stamp in the classification of other tabooed things makes them doubly an outlaw. There is a State law under which such devices must be affirmed to be illegal. This is the same State law which, as will be remembered, was invoked by a no less personage than the attorney general of the State for the suppression of the illegal tontine diamond graft here some four or five years ago.

"'The similarity between the trading stamp graft and the so-called tontine plan for acquiring ownership of diamonds is too close to escape attention [meaning that the buisiness of plaintiffs is disreputable, dishonest, and illegal]. Both have as their chief element of attractiveness to uninformed persons a pretended offer to give something for nothing—that is, to give a greater value than that for which one may have paid. Both, too, are dependent for the enormous profits yielded to their promoters on the great percentage of "lapses"—that is, failures to carry out their original intention on the part of those who may be seduced by the promise of something for nothing to invest in the scheme.

"'The result of the crusade against the tontine diamond fake is still fresh in the public mind. The chief promoter of the graft fled the city and the swindling enterprise was speedily broken up.

"'The trading.stamp concerns [meaning as one of these, these plaintiffs doing business as the Michigan Trading Stamp Company] may struggle against the inevitable and resort to every technical obstruction which the civil courts may place at their command, but the result is already discernible. They [meaning, among others, these plaintiffs doing business as the Michigan Trading Stamp Company] are outlaws and must yield ultimate obedience to the authority which has denounced them as such.'

" That at the time of the committing by the said defendant of the said grievances there were only four, or thereabouts, trading stamp companies engaged in the trading stamp business in the city of Detroit, of which the Michigan Trading Stamp Company, plaintiff herein, was one, so that when said false, malicious, and injurious article was published, as herein set forth, the attention of all the readers thereof was directed to this plaintiff as one of said four companies, and these plaintiffs, doing business as aforesaid as the Michigan Trading Stamp Company, were identified in the minds of the readers of said paper and of the customers of these plaintiffs, doing business as afore-

said, as being one of the companies referred to in such false publication," etc.

There were six reasons stated in the demurrer. It is conceded that upon the record presented here some of them are not well taken. The two reasons which we will consider are stated as follows:

"4. The articles published in defendant's newspaper of which plaintiffs complain do not refer particularly to the plaintiffs, but generally to all persons engaged in the trading stamp business. In other words, said articles have no personal application to the plaintiffs, and therefore are not libelous.    *    *    *

"6. The said declaration does not state facts sufficient to constitute a cause of action."

It will be observed that the only suggestion made in the declaration that plaintiff had brought suit against the city of Detroit is in the innuendo. In *Taylor* v. *Kneeland,* 1 Doug. (Mich.) 67, it is said:

"Has the plaintiff alleged anything in the inducement to warrant this innuendo? Here the actionable quality of the words arises from extrinsic circumstances, and, Starkie says, those circumstances must appear, and that the method of putting them upon record is: 1. By an introductory part, or inducement, and stating them by averment. 2. By a colloquium connecting them with the libel or slander, as by saying that the words were spoken 'of and concerning' the extrinsic facts so averred in the inducement. 3. By an innuendo applying the different parts of the charge to the different facts before averred and set forth in the inducement. Starkie on Slander, p. 290.

"The innuendo, therefore, can do nothing more than refer back to some facts stated in the inducement; for the truth of an innuendo must always appear from precedent averments, and the inducement and colloquium must warrant the innuendo."

See, also, *Lewis* v. *Soule,* 3 Mich. 514, and cases cited in the note; *Bourreseau* v. *Journal Co.,* 63 Mich. 425; *Vickers* v. *Stoneman,* 73 Mich. 421, 422. We have, then, a declaration without any proper averment that plaintiff had commenced a suit against the city of Detroit.

The important question is whether upon this record the fourth reason stated in the demurrer, reading as follows: "The articles published in defendant's newspaper of which plaintiffs complain do not refer particularly to the plaintiffs, but generally to all persons engaged in the trading stamp business; in other words, said articles had no personal application to the plaintiffs, and therefore are not libelous"—is well taken.

Counsel are not so far apart about what the law is as they are as to whether the averments of the declaration bring the case within the rule. Counsel for plaintiff say:

"Unless this court shall be able to say that the libelous articles complained of cannot by any reasonable construction be found to refer to plaintiffs, then the question whether or not the readers of the articles believed or understood they referred to the plaintiffs is one of fact, to be submitted to a jury.  *  *  *

"The rule which determines whether or not an action will lie where a class of people is libeled is: 'Do the defamatory words refer to some ascertained or ascertainable person?'"—claiming this case comes within such rule, citing *Fenstermaker* v. *Publishing Co.*, 12 Utah, 439 (35 L. R. A. 611); *Wofford* v. *Meeks*, 129 Ala. 357 (55 L. R A. 214); *Jones* v. *State*, 70 Am. St. Rep. 756 (38 Tex. Crim. Rep. 364), and other authorities.

Counsel for defendants insist that—

"Where libelous matter is published against a class of persons, an individual of that class cannot maintain an action for the publication unless the words refer specially to him. If they do refer specially to him, then, notwithstanding the fact that they also apply to others, he may maintain an action. The true rule is that where the words apply to a class of persons, and not specially to a particular group of such class, an individual of that class cannot maintain an action; but, if they apply specially to a particular group of such class, any member of such group may maintain an action"—citing 18 Am. & Eng. Enc. Law (2d Ed.), p. 1053; *Eastwood* v. *Holmes*, 1 Foster & Fin. 347; *Ellis* v. *Kimball*, 16 Pick. (Mass.) 132; *Stewart* v. *Wilson*, 23 Minn. 449; *Lewis* v. *Soule*, 3 Mich. 514; *McGraw* v. *Free Press*, 85 Mich. 203, and other cases.

The case of *Ryckman* v. *Delavan*, 25 Wend. (N. Y.) 186, is quoted by counsel for both sides in support of their respective contentions, and is recognized by them as a leading case.    The case was as follows:

"Ryckman sued Delavan for a libel and set forth in his declaration a publication of the defendant, in which it was stated that certain malting establishments on the Hill in Albany [owned by particular individuals, but not naming the plaintiff as one of those individuals] were supplied with water for malting from stagnant pools, gutters, and ditches, often in such a [putrid] state as to be green on the surface; and that there were several malthouses on the Hill, all of which relied on water taken occasionally from such places as before described.    The plaintiff alleged that before and at the time of the publication he was maltster and brewer in the city of Albany, and was in the use and occupation of a malthouse and malting establishment at a place in the city of Albany called the 'Hill,' where he carried on the business of malting grains for brewing, and that to injure him in his good name and to destroy his business the defendant published, etc., the alleged libel."

Ten of the judges voted for a reversal and nine for an affirmance.    The minority opinion was written by Chancellor Walworth.    He first states the rule in an action of slander, and then says:

"It is otherwise, however, in the case of libels, where the whole is in writing or print, and all the external facts, to show the application of the libelous matter, must be spread upon the declaration, to enable the court to see that it must have been applied to the plaintiff as an individual, and not to a class of persons merely, when he sues for a personal libel on himself.    Here the charge in the publication that there were several malthouses on the Hill, all of which, as the defendant's informant believed, relied occasionally on water taken from such places as had been described, did not necessarily, neither could it by common intendment be construed to charge every individual who was interested in any malting establishment at that place, either as a copartner or otherwise, with having been personally concerned in the use of the impure water occasionally, or that every individual thus interested had a personal knowledge of the fact.    The averment, therefore,

that there were only 6 malthouses on the Hill, in which 12 persons were interested, either as copartners or sole owners, and that the plaintiff was interested in one of them as a copartner with two other individuals, does not necessarily show that the writer of the article intended to apply this particular clause of it personally to the plaintiff. Neither do I believe that a reader of the article who was fully acquainted with all the facts stated in this declaration would, in reading this article, be likely to give it a personal application to each of these 12 individuals."

Later in the opinion he uses the following language:

" I am not at present aware of any case, either in this State or in England, where a private action for a libel reflecting upon a body or class of persons has been sustained. The only case, indeed, that I know of in any other country is one suit in Scotland brought by a lieutenant colonel in behalf of his whole regiment for defamation, in calling them a regiment of cowards and blackguards. In that case the defendant did not appear upon the trial, as he was out of the country; and the lord commissioners, before whom the issue was tried, expressly told the jury that the damages given by them were not for an individual injury to the person, but for an injury done to the regiment. *Shearlock* v. *Beardsworth,* 1 Murray's Rep. of Jury Cases, 196.

" I have no doubt, therefore, that the decision of the supreme court in this case was in conformity with the law as now settled, both here and in England, and that the judgment of that court should be affirmed."

Senator Verplanck, who wrote the opinion holding the article libelous, laid great stress upon the fact that the article stated "there were several malthouses on the Hill, *all of which* relied on water taken occasionally from such places," as before described, and was of the opinion that this was equivalent to saying that every malthouse on the Hill, etc. In his opinion he uses this language:

" It is very evident that the charge is general, and includes all those who own and carry on business in the several malthouses described. Of these persons the plaintiff is one. The accusation includes all of them; and this, therefore, does not resemble those ancient cases in libel or slander where it was held with more strictness than courts

now entertain that when a charge was made upon some one person indefinitely out of many, without any indication of the individual meant, the action was not maintainable on account of the uncertainty of the charge."

He recognizes the rule stated by the chancellor in the following language:

"The distinction between a libel aimed at an individual, and the censure or satire of a whole class of the community to which that individual happens to belong is unquestionable, being alike founded in the reason of the thing and supported by authority. No better definition of a libel can be given than that of Chief Justice Parsons:

"'A libel is a malicious publication, expressed either in printing or writing, or by signs and pictures, tending either to blacken the memory of one dead, or the reputation of one who is alive, and expose him to public hatred, contempt, or ridicule.' Commonwealth v. Clap, 4 Mass. 168.

"To the same effect is the definition given by Hamilton, in the celebrated Croswell Case, 3 Johns. Cas. (N. Y.) 337, and since repeatedly adopted in our own courts, as in Steele v. Southwick, 9 Johns. (N. Y.) 215. In a private suit it is the injury inflicted upon the individual for which pecuniary compensation is sought.

"It is the malicious intention of the libeler towards the injured individual that authorizes the latter to seek redress. The proof, or else the necessary presumption of individual malice, and the inflicting individual injury, are the sole grounds of the civil action and of the remedy it affords. General censure or reproof, satire or invective, directed against large classes of society, whether on moral, theological, or political grounds, cannot ordinarily be prompted by individual malice or intended to produce personal injury. The politician who assails the opposite party, the polemical divine who attacks the doctrine or the discipline of another church or sect, or the moral satirist who lashes the vices or the foibles of his age and nation, ought not to be held responsible in private suits for the bold avowal of opinions, true or false. The principle upon which the civil remedy is allowed does not apply here; and the great interests of society require that it should not be made to apply. It is far better for the public welfare that some occasional consequential injury to an individual arising from general censure of his pro-

fession, his party, or his sect should go without remedy than that free discussion on the great questions of politics, or morals, or faith should be checked by the dread of embittered and boundless litigation.    When such publications so far transcend the limits of fair discussion or legitimate moral rebuke, as to threaten public injury, they are most effectually, as well as most properly, prevented or punished by public prosecution.

"But both in civil and in criminal prosecutions, whether it be punishment that is sought or compensation for an injury inflicted by libel upon an individual, the rule laid down long ago in *Rex* v. *Alme*, 3 Salk. 224, must apply:

" 'Where a writing inveighs against mankind in general, or against a particular class of men, as for instance, men of the gown, this is no libel.' "

And concludes his opinion as follows:

"I have accordingly no doubt that the present decision of the supreme court ought to be reversed.    I hold that a declaration on libel cannot be adjudged insufficient by reason of the accusation being directed against a class of society, unless it is manifest and unquestionable that the charge is clearly made against a class of society or an order or body of men as such, and cannot possibly import any personal application tending to private injury.    If to the common understanding of men the description evidently points to several individuals, or if, on the face of the declaration, it appears that the words are capable of being so meant and understood, then the fact of a person being defamed under a description of office or of profession, common to himself and other individuals included in the same libel, cannot take away the right of private action."

The record shows there were several malthouses on the Hill.    The publication stated, among other things, that all of them relied on water taken occasionally, etc.    This was equivalent, as the opinion states, to saying that every one of them used the putrid water.    Suppose, instead of criticising the methods of each and all of the maltsters on the Hill in conducting their business, the calling, or occupation, the class generally known as maltsters, had been criticised, and it had been asserted that beer drinking was harmful, and that a community would be better off if it

contained no maltsters, is it not likely that the 10 who voted for a reversal would have joined the nine in affirming the case ?   Suppose a local paper published in a community having but four saloons should say that the saloon business was harmful to the young, was a producer of drunkenness, that its results were altogether bad, could it be said that such criticism would entitle each saloon keeper to maintain an action for libel ?   Or suppose in a community where there was but one football team a paper was to publish an article asserting that the game of football was a cruel and brutal sport, which was worthy of the severest condemnation, could it be said that this was a charge that each member of the team was cruel and brutal, for which he could successfully maintain a libel suit against the publisher ?   We think each of these questions must be answered in the negative.   Trading stamp concerns are spoken of in the first article set out in the declaration of the plaintiff as " the get-rich-quick industry."   This refers to trading stamp concerns generally, and not to any particular trading stamp concern.   In another article the business is spoken of as " the trading stamp fake."   This refers to the business generally, and not to any particular individual.   In another article it is said :   "Mr Hunt appreciates the damage done to business by the trading stamp bloodsuckers."   This refers in general terms to the men engaged in the business, and not to any particular person engaged therein.   We then have in this case a class of persons in Detroit engaged in the conduct of trading stamp concerns. A publication is made which does not refer to all of the persons engaged in that business in Detroit, but does refer generally to the trading stamp concerns of that city. We think the case stated will not sustain an action of libel.

The action of the circuit judge in sustaining the demurrer is affirmed.

GRANT, OSTRANDER, and HOOKER, JJ., concurred. McALVAY, J., concurred in the result.