MICHIGAN UNITED CONSERVATION CLUBS, a Michigan non-profit Corporation, in its own right, and in behalf of its members; Thomas L. Washington, Carl Johnson, Fred Bear, Thomas Anderson and Ben East, in their own right and in behalf of all sport game hunters in the State of Michigan, Plaintiffs,

v.

CBS NEWS, a Division of CBS, Inc., Defendant.

No. G75–524 C.A.

United States District Court, W. D. Michigan, S. D.

Feb. 25, 1980.

---

Glassen, Rhead, McLean & Campbell, Neil A. McLean and Harold W. Glassen, Lansing, Mich., of counsel, for plaintiffs.

Varnum, Riddering, Wierengo & Christenson, F. William Hutchinson, Grand Rapids, Mich., Butzel, Long, Gust, Klein & Van-Zile, George E. Brand, Jr., Detroit, Mich., of counsel, for defendant.

## OPINION

FOX, Senior District Judge.

Plaintiffs have brought suit against defendant CBS News claiming that they were defamed by two of defendant's television broadcasts concerning the subject of hunt-

ing. This case was properly removed from state circuit court, and this court immediately dissolved the state court's injunction which prevented defendant from re-broadcasting the shows. Defendant has now filed a motion for summary judgment alleging that plaintiffs' claims of defamation are not actionable. This will be treated below.

Plaintiffs consist of the Michigan United Conservation Clubs (hereinafter referred to as MUCC), Thomas L. Washington, who is the Executive Director of MUCC, and several sport hunters who reside in Michigan and who claim to represent "more than one million sport hunters and hunting license buyers within the State of Michigan." As stated in its complaint, MUCC is a Michigan non-profit corporation with more than one hundred thousand Michigan members; its corporate purpose is:

To further and advance the cause of the environment and conservation in all phases, and to perpetuate and conserve the fish, game, mineral, air, water, forest and land resources of the state; to so manage the use of all natural resources that this generation and posterity will receive the maximum benefit from the same.

To promote programs designated to educate citizens in the cause of natural resource conservation and environmental protection and enhancement, creating in them an awareness and understanding of the importance of this aim and equipping them to work knowledgeably and effectively toward this achievement.

(Complaint, pp. 1–2.)

Defendant CBS News is a division of Columbia Broadcasting Systems, Inc.—one of the country's largest radio and television broadcasters. Its television programs are transmitted to its affiliate stations, including several in the State of Michigan, and are thereafter broadcast to the public.

Plaintiffs claim that they were defamed by two of defendant's telecasts: "The Guns of Autumn," shown on Friday, September 5, 1975, and "Echoes of 'The Guns of Autumn,'" broadcast on Sunday, September 28, 1975. In their brief in opposition to defendant's motion for summary judgment, plaintiffs reemphasize that this is a defamation action and they state how they were defamed by the two broadcasts in question:

Plaintiffs contend that said documentaries were defamatory to them in that they presented only the unfavorable aspects of hunting and did not present the "hunting ethic" practiced by a vast majority of Michigan hunters. Plaintiffs submit that they have personally been embarrassed, maligned and ridiculed as a result of public reaction to said "documentaries."

In its motion for summary judgment, defendant asserts that plaintiffs' claims must be dismissed because neither of its broadcasts were "of and concerning" them.

### I.

In reviewing a motion for summary judgment, a court is to read the record in a light most favorable to the non-moving party; is to accept his allegations as true, and is to give him the benefit of the doubt when his assertions conflict with those of the movant. *United States v. Diebold*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Bosely v. City of Euclid*, 496 F.2d 193, 197 (6th Cir. 1974). After doing all this, the motion for summary judgment should be granted only where it is shown that no issue of material fact exists and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56.

Since a grant of summary judgment will preclude a trial on the merits, it has been said that it should be cautiously invoked. 10 C. A. Wright & A. Miller, Federal Practice & Procedure, § 2712, at 387 and n. 55 (1973). Courts, however, should not be cowered into timidity for summary judgment can also serve important functions. "Chief among these are avoidance of long and expensive litigation productive of nothing, and curbing the danger that the threat of such litigation will be used to harass or to coerce a settlement." *Washington Post Co. v. Keogh*, 125 U.S.App.D.C. 32, 35, 365 F.2d 965, 968 (D.C. Cir. 1966).

The *Keogh* court makes clear that in the First Amendment area courts should not be reluctant to use summary procedures. *Id.* Similar reasoning was expressed by the district court in *Guitar v. Westinghouse Electric Corp.*, 396 F.Supp. 1042, 1053 (S.D.N.Y. 1975), which stated that "because of the importance of free speech, summary judgment is the 'rule' and not the exception, in defamation cases." *Accord, Schuster v. U. S. News & World Report, Inc.*, 459 F.Supp. 973, 975 (D.Minn.1978). The reasoning behind such rulings lies in the realization that if lawsuits could be threatened every time someone advocated an unpopular opinion on a public issue then the exercise of First Amendment rights could be seriously chilled because those who do not have the money to litigate or who merely wish to remain cautious and avoid litigation will employ self-censorship. Public comment and criticism will necessarily become "less uninhibited, less robust, and less wide-open." *Washington Post v. Keogh, supra.* This would emasculate the very values which the founders of this country were trying to preserve:

> The dissemination of the individual's opinions on matters of public interest is for us, in the historic words of the Declaration of Independence, an "unalienable right" that "governments are instituted among men to secure." History shows that the Founders were not always convinced that unlimited discussion of public issues would be "for the benefit of all of us" but they firmly adhered to the proposition that the "true liberty of the press" permitted "every man to publish his opinion."

*Curtis Publishing Co. v. Butts*, 388 U.S. 130, 149, 87 S.Ct. 1975, 1988, 18 L.Ed.2d 1094 (1967).

## II.

During the hearings on defendant's motion, this court had occasion to view the films in question. "The Guns of Autumn" concerns sport hunting and segments were filmed in Michigan. "Echoes of 'The Guns of Autumn'" presented the public's reaction to "The Guns of Autumn," and it presented the views of several individuals who disliked the broadcast.

The impact of "The Guns of Autumn" lies in its graphic portrayal of men hunting and killing game animals. The broadcast's opening sequences show hunters at a resort dump in Michigan's Upper Peninsula. Bears feed at the dump, and many which were depicted had apparently lost their fear of humans because on the day before bear hunting season began they were feeding from hunters' hands. The next day, however, they were shot when they returned to feed.

This scene was followed by another Michigan bear hunt; this one conducted at a hunting camp attended by men and their sons. On the night before the hunt, the group sat around a campfire and the men stated why they hunt and why they hoped their sons would become hunters. In the morning, the hunt began with the men using dogs, trucks, and two-way radios to track their prey. The hunt ended when they had trapped a bear up a tree and shot it.

A third Michigan scene was filmed on a private game preserve outside Detroit. It showed a hunter shoot a deer and then, as it lay wounded, shoot it several more times at point-blank range to end its agony.

Other segments of the show presented deer hunting in Colorado and Utah; waterfowl hunting on a state-managed wetlands area in Pennsylvania; state supervised and managed buffalo hunting in Arizona, and exotic animal hunting in Texas.

"Echoes of 'The Guns of Autumn'" presented the strong, and mostly unfavorable, reactions which people had to "The Guns of Autumn." It started with a statement of the controversy created by the show and the problems which its sponsors had. It presented the views of the following individuals: the vice president of the National Rifle Association, a sportscaster, a director of a Humane Society, an experienced hunter, a gun store proprietor, a United States Senator, a training specialist with the Utah Division of Wildlife Re-

sources, and hunters in Maine. Also presented were two film clips made by the Remington Arms Company and scenes of a hunter training class.

In their pleadings, plaintiffs do not dispute that what was shown actually occurred and was not staged. They instead claim that CBS intentionally presented only the "slob hunters" whose actions are exceptional and not approved or followed by the general hunting fraternity.

### III.

### A.

This court will first consider the claims of the four sport hunters who have filed suits in their own behalf and as representatives of the more than one million sport hunters and hunting license buyers in Michigan. Their complaint alleges that CBS conspired with Cleveland Amory, a critic of sport hunting, "to discredit, malign, downgrade, ridicule and vilify the American sport hunter and especially the more than one million sport hunters within the State of Michigan." They continue by stating:

That the aforesaid actions of the defendant C.B.S. have slandered and libeled each and every sport game hunter within the State of Michigan in that he has been ridiculed and endeavored to be placed in disrepute and has been and is embarrassed. That the actions of C.B.S. and the scenes contained in its said documentaries were intentionally biased and unfair and intended to portray the Michigan sport hunter as cruel, selfish and unfeeling . . . .

One of the crucial elements needed to establish a prima facie case of defamation is that the publication must be "of and concerning" the plaintiff. *See, e. g., Watson v. Detroit Journal Co.*, 143 Mich. 430, 107 N.W. 81 (1906); *Boehmer v. Detroit Free Press Co.*, 94 Mich. 7, 53 N.W. 822 (1892); *McGraw v. Detroit Free Press Co.*, 85 Mich. 203, 48 N.W. 500 (1891); *Lewis v. Soule*, 3 Mich. 514 (1855); Restatement (Second) of Torts §§ 558, 564, 564A (1977); Restatement of Torts, § 564 (1938). Thus,

even where a publication may be clearly defamatory as to somebody, if the words have no personal application to the plaintiff they are not actionable by him. W. Prosser, The Law of Torts, § 111, p. 749 (4th ed. 1971).

In the instant case, defendant's motion for summary judgment requests that this court rule as a matter of law that the two television programs were not "of and concerning" the plaintiffs. It points out that plaintiffs have not alleged that they were in any way shown, described, mentioned, referred to, identified, or portrayed in the broadcasts, and that, instead, plaintiffs have disassociated themselves from the hunting practices which were depicted. It is asserted that a publication which is alleged to defame a group of one million hunters is not actionable.

Plaintiffs respond by arguing that whether the broadcasts concern them is a question of fact to be decided by the jury, and this makes summary judgment inappropriate.

Since the injuries alleged by plaintiffs flow from the alleged libel of a group, this case must be governed by the special rules applicable to group libel. Under these rules, it is for the court, in the first instance, to determine if the alleged libel is reasonably capable of bearing an application to the plaintiffs, and only if such a construction is possible will the case go to the jury for a determination of whether the publication did, in fact, concern the plaintiffs. *See, e. g., Watson v. Detroit Journal Co., supra; Boehmer v. Detroit Free Press Co., supra; Welch v. Tribune Publishing Co.*, 83 Mich. 661, 671, 47 N.W. 562 (1890); *Beznos v. Nelson*, 8 Mich.App. 669, 672, 155 N.W.2d 241 (1967); *Chapman v. Romney*, 6 Mich.App. 36, 148 N.W.2d 230 (1967); *Ball v. White*, 3 Mich.App. 579, 583–4, 143 N.W.2d 188 (1966).

In determining which claims are actionable, the Restatement states that an individual member of the group or class can maintain a suit only if: "(a) the group or class is so small that the matter can reasonably be understood to refer to the member, or (b) the circumstances of publication reasonably

give rise to the conclusion that there is particular reference to the member." Restatement (Second) of Torts, § 564A; *Accord, Golden North Airways v. Tanana Publishing Co.*, 218 F.2d 612, 618–620, 15 Alaska 303 (9th Cir. 1955); *Fowler v. Curtis Publishing Co.*, 86 U.S.App.D.C. 349, 182 F.2d 377 (D.C.Cir.1950), *aff'g* 78 F.Supp. 303 (D.D.C.1948); *Noral v. Hearst Publications, Inc.*, 40 Cal.App.2d 348, 104 P.2d 860 (1940); *Macauley v. Bryan*, 339 P.2d 377, 70 A.L. R.2d 1378 (Nev.1959); W. Prosser, *supra*, § 112, pp. 749–751; Restatement of Torts, § 564, comment c (1938); Annot., 70 A.L. R.2d 1382 (1960). Professor Prosser has summarized the rule in his treatise:

> The plaintiff must first of all show that he is in fact a member of the class defamed. Beyond this, he must establish some reasonable personal application of the words to himself. If the group is a very large one, as in the case of such words as "all lawyers are shysters," they are considered to have no application to anyone in particular, since one might as well defame all mankind. Not only does the group as such have no action, but the plaintiff does not establish any personal reference to himself. But if the plaintiff is the only lawyer present, or for some other reason the words are reasonably understood by the hearers to be directed individually at him, the personal application may be made to appear by pleading and proof of the special circumstances by way of inducement, and the innuendo. The rule has been applied quite uniformly to comparatively large groups or classes of a definite number, exceeding, say twenty-five persons. When the group becomes smaller than that, as in the case of a jury, a family, an election board, or the four officers of an association, the courts have been willing to permit the conclusion that the finger of defamation is pointed at each individual.

W. Prosser, *supra*, § 112, pp. 750–751 (footnotes omitted).

The philosophy for establishing such a rule was best set forth in *Service Parking Corp. v. Washington Times Co.*, 67 App.D.C. 351, 354–355, 92 F.2d 502, 505–506 (D.C.Cir.

1937), in which the court held that an article which referred to a "parking lot racket" in Washington, D.C., was too general to permit the operator of one lot to sue:

> The rule thus stated by the courts and text writers represents, undoubtedly what has been regarded as a sound compromise between the conflicting interests involved in libel cases. On the one hand is the social interest in free press discussion of matters of general concern, and on the other is the individual interest in reputation. The courts have chosen not to limit freedom of public discussion except to prevent harm occasioned by defamatory statements reasonably susceptible of special application to a given individual.

An analysis of Michigan law indicates that it is in accord with the general rules set forth above. In *Watson v. Detroit Journal Co.*, 143 Mich. 430, 107 N.W. 81 (1906), two trading stamp companies claimed that they had been libeled by a newspaper article which spoke generally of trading stamp concerns and labeled them as "outlaws" and likened them to certain illegal businesses. In analyzing the plaintiffs' claim, the Michigan Supreme Court recognized that statements which in no way applied to the plaintiff, but only concerned a large group to which plaintiff belonged, were not actionable. In reaching its decision, the court stated:

> Suppose a local paper published in a community having but four saloons should say that the saloon business was harmful to the young, was a producer of drunkenness, that its results were altogether bad, could it be said that such criticism would entitle each saloon keeper to maintain an action for libel? Or suppose in a community where there was but one football team a paper was to publish an article asserting that the game of football was a cruel and brutal sport, which was worthy of the severest condemnation, could it be said that this was a charge that each member of the team was cruel and brutal, for which he could successfully maintain a libel suit against

the publisher? We think each of these questions must be answered in the negative. Trading stamp concerns are spoken of in the first article set out in the declaration of the plaintiff as "the get-rich-quick industry." This refers to trading stamp concerns generally, and *not to any particular trading stamp concern.* In another article the business is spoken of as "the trading stamp fake." This refers to the business generally, and *not to any particular individual.* In another article it is said: "Mr. Hunt appreciates the damage done to business by the trading stamp bloodsuckers." This refers in general terms to the men engaged in the business, and *not to any particular person engaged therein.*

*Id.,* at 440, 107 N.W. at 85 (emphasis supplied).

Decisions from the Michigan Court of Appeals have also dismissed libel claims brought by individual members of large groups. In *Chapman v. Romney,* 6 Mich. App. 36, 148 N.W.2d 230 (1967), a member of the John Birch Society claimed that he had been defamed by statements that the Society used Communist tactics. In approving the trial court's grant of summary judgment in favor of defendant, the Court ruled that under Michigan law "it is not enough for the complainant merely to plead that he is a member of a group allegedly defamed . . . ." *Id.,* at 40, 148 N.W.2d at 232. Instead, the Court ruled:

"Where a defamatory publication affects a class of persons without any special personal application, no individual of that class can maintain an action for the publication; and it has been held that, where defamatory statements are made against an aggregate body of persons, an individual member not specifically imputed or designated cannot maintain an action."

*Id.,* at 39, 148 N.W.2d at 231, *quoting from* 53 C.J.S. Libel and Slander § 11, p. 55. Similar holdings have been reached in *Arber v. Stahlin,* 10 Mich.App. 181, 159 N.W.2d 154 (1968), and *Benzos v. Nelson, supra.*

The only time that a Michigan appellate court has ruled that a jury should determine if an individual has been defamed as a result of statements about a group to which he belongs is when the alleged defamation concerns a small group or where it singles out that individual; in such cases, summary judgment has been ruled inappropriate. In cases involving small groups, " 'the courts have been willing to permit the conclusion that the finger of defamation is pointed at each individual member,' " and this sufficiently identifies him so that a motion for summary judgment must be denied. *See, e. g., Ball v. White,* 3 Mich.App. 579, 583, 143 N.W.2d 188, 190 (1966), *quoting from* W. Prosser, The Law of Torts, § 92, pp. 583–584 (2nd ed.). Good illustrations of this point can be found in: *Welch v. Tribune Publishing Co.,* 83 Mich. 661, 671, 47 N.W. 562 (1890), where a member of a jury was allowed to maintain suit for statements about the jury; *Boehmer v. Detroit Free Press Co.,* 94 Mich. 7, 53 N.W. 822 (1892), where the plaintiff, a member of a township board, was allowed to maintain suit for comments implying that one member of the board had accepted a bribe; and *Ball v. White, supra,* in which the plaintiff was a member of a small group of employees which was allegedly defamed. These examples comport with those found in the Restatement, which recognizes that statements about a jury or a city council may give individual members of those groups a cause of action. *See,* Restatement (Second) of Torts, § 564A, comment b (1977); Restatement of Torts, § 564, comment c (1938).

■ In the instant case, plaintiffs belong to a group of more than one million individuals. As a matter of law, the defamation of a group this large can have no personal application to individual members, thus the only way a group member can maintain suit is if the circumstances surrounding publication give rise to the conclusion that that member was being focused upon. Restatement (Second) of Torts, § 564A. Plaintiffs have not shown such circumstances and this court must dismiss their claim.

If plaintiffs were allowed to proceed with this claim, it could invite any number of vexatious lawsuits and seriously interfere with public discussion of issues, or groups, which are in the public eye. Statements about a religious, ethnic, or political group could invite thousands of lawsuits from disgruntled members of these groups claiming that the portrayal was inaccurate and thus libelous. Such suits would be especially damaging to the media, and could result in the public receiving less information about topics of general concern.

To avoid this conflict with First Amendment values, see, e. g., *New York Times v. Sullivan*, 376 U.S. 254, 288–292, 84 S.Ct. 710, 730–732, 11 L.Ed.2d 686 (1964), this court must reaffirm the general tort principle which requires that a publication specifically refer to or point to the plaintiff before he is permitted to maintain a suit. As the Court in *Ryckman v. Delevan*, 25 Wend. 186 (N.Y.) stated:

> "It is the malicious intention of the libeler towards the injured individual that authorizes the latter to seek redress. The proof, or else the necessary presumption of individual malice, and the inflicting individual injury, are the sole grounds of the civil action and of the remedy it affords. General censure or reproof, satire or invective, directed against large classes of society, whether on moral, theological, or political grounds, cannot ordinarily be prompted by individual malice or intended to produce personal injury. The politician who assails the opposite party, the polemical divine who attacks the doctrine or the discipline of another church or sect, or the moral satirist who lashes the vices or the foibles of his age and nation, ought not to be held responsible in private suits for the bold avowal of opinions, true or false. The principle upon which the civil remedy is allowed does not apply here; and the great interests of society require that it should not be made to apply. It is far better for the public welfare that some occasional consequential injury to an individual arising from general censure of his profession, his party, or his sect should go without

> remedy than that free discussion on the great questions of politics, or morals, or faith should be checked by the dread of embittered and boundless litigation."

*Watson v. Detroit Journal Co.*, 143 Mich. 430, 438–439, 107 N.W. 81, 85 (1906).

### B.

MUCC and its Executive Director, Thomas Washington, have also alleged that they were defamed by defendant's broadcasts. They claim that there was a conspiracy between CBS and various anti-hunting groups, the intent of which was to portray the Michigan sport hunter as a malicious, unfeeling killer. MUCC claims that this type of presentation was made in "The Guns of Autumn" and this libeled it and the sport hunters of Michigan who are, or will become, members of MUCC; this has allegedly caused it to lose credence with its members and has resulted in a drop in membership income. Washington claims that the films caused him to be criticized by the members and directors of MUCC and this jeopardized his job. Both MUCC and Washington assert that the film was published maliciously and to support this they state that CBS secured their cooperation by intentionally misleading them about how the subject of sport hunting would be treated.

The claims of both MUCC and Washington are essentially based on the fact that they have suffered as a result of CBS's alleged defamation of Michigan's sport hunters; however, such an injury is not cognizable by this court. First, this court has already ruled that the alleged defamation of the hunters is not actionable, therefore, any derivative claims by MUCC or its Executive Director can also not be actionable. Secondly, even if this court were to have held that the hunters had a cause of action, the indirect injury which these plaintiffs claim to have suffered as a result of this would not be compensable. As the court stated in *Fowler v. Curtis Publishing Co.*, 78 F.Supp. 303, 304 (D.D.C. 1948), aff'd 86 U.S.App.D.C. 349, 182 F.2d 377 (D.C.Cir.1950):

It is well established that only a party concerning whom the defamatory matter is published may maintain an action for libel. A person who is injured by reason of the fact that someone else is libeled has no right of recovery. Any detriment he sustains is damnum absque injuria.

MUCC claims that it should be able to maintain its suit because its members were among the sport hunters who were defamed. Nothing in either film indicates that the Michigan hunters who were portrayed belonged to MUCC; nor do the films imply that the hunting practices which were depicted were condoned by MUCC. In fact, nothing in the broadcast singles out or points to MUCC, and at the hearing on this matter its attorney confirmed this by pointing to no such references.

In the absence of any references which would implicate MUCC with the hunting practices presented, this court must dismiss MUCC's argument on this point. If this court were to do otherwise, it would be in the anomalous position of ruling that un-named members of a large group cannot maintain suit, but that an unnamed organization which claims to represent some of the group can maintain suit. In either case, there is a threat to open and free debate based on a threatened lawsuit from those who have not been personally vilified but are only unhappy about the presentation. Therefore, this court holds that unless the publication has some personal reference or application to the individual, or to an organization, a suit brought by either of them cannot be maintained.

### C.

The only plaintiff who was in any way implicated by either of the two programs in question was Thomas Washington, Executive Director of MUCC. At one point in "The Guns of Autumn" his voice is heard.

The segment in question portrays deer hunting in Colorado and Utah. It starts with an interview with a resident of Rifle, Colorado who states that hunters in years past have killed so many deer that there are not many left in the area. The scene then shifts to Utah and a dance that precedes the start of hunting season. This is followed by scenes of deer hunters walking along the side of a hill. As the scene progresses, the views of several individuals are heard on the soundtrack:

HUNTER: You do it once, and then just about the time the feel—the feeling's fading away it's time to go hunting again, you know. You can't sleep for a week afterwards, you know. Keep thinking about it, you know, how the hunt—how you chased them and, you know, went through the woods and, you know, it's just—just a nice feeling.

HUNTER: I'm 62 years old. I've hunted ever since I was old enough to carry a rifle or a shotgun. It's just—it gets in your blood. It's like gambling or drinking. It gets in your blood.

HUNTER [woman]: I think if any—if you're good at something you—that you really enjoy it. It's—It's being able to do something, and say, "I can do it."

HUNTER: Nature's way is actually very cruel, and the ultimate death of most animals comes cruelly, either via predation or starvation or some form of disease in nature. The hunter's way is actually quite humane.

The last comment was made by Mr. Washington, although nothing in the broadcast identified this as his voice. As his words were being spoken, the film showed hunters, in either Colorado or Utah, lifting a dead deer onto the back of a pick-up truck. After Mr. Washington's remark was finished, the film shifted scenes to a hunters' training school in Connecticut.

At the hearing on this matter, plaintiffs' attorney stated that Mr. Washington's quote was defamatory to him for two reasons: first, it was broadcast during a scene filmed in Colorado, and Mr. Washington did not speak these words in Colorado; second, because the words were broadcast at the same time that hunters were seen loading a dead deer onto a truck. Defendant argues that this was not "of and concerning" Mr. Washington since he was not identified by name.

■ Before this court considers the "of and concerning" issue, it must address one which is more fundamental—that being, whether the publication has defamed Mr. Washington. It is a well established rule that it is the duty of the court to determine if a communication is capable of bearing a defamatory meaning. *Washington Post Co. v. Chaloner,* 250 U.S. 290, 293, 39 S.Ct. 448, 63 L.Ed. 987 (1919); *Commercial Publishing Co. v. Smith,* 149 Fed. 704, 706–707 (1907); *Van Lonkhuyzen v. Daily News Co.,* 203 Mich. 570, 587–588, 170 N.W. 93 (1918); Restatement (Second) of Torts, § 614 (1977). In making this decision, the court must decide two questions: first, whether the communication is reasonably capable of conveying the particular meaning, or innuendo, ascribed to it by the plaintiff; and second, whether that meaning is defamatory in character. Restatement (Second) of Torts, § 614, comment b. If the publication is capable of more than one meaning, and one of these is defamatory, then it is for the jury to determine whether the communication was understood as being defamatory. *Washington Post Co. v. Chaloner, supra ;* Restatement (Second) of Torts, § 614(b).

■ After reviewing both films, this court finds nothing defamatory in Mr. Washington's quote, or in the circumstances surrounding its broadcast. This is the case whether the quote is viewed in context with the whole of both films, or is considered in context with the segment on hunting in Colorado and Utah.

His statement is nothing more than his belief that the sport hunter is not as cruel to animals as nature itself is. This is a position that is consistent with the philosophies of groups which support sport hunting, as can be seen from "The Echoes of 'The Guns of Autumn' " in which this same opinion was expressed by hunters in Maine and by a Remington Arms Company film. And while Mr. Washington's quote may have only been a part of a larger interview which he gave CBS, plaintiff did not indicate that the quote was taken from the interview in such a fashion that it resulted in a misrepresentation of Mr. Washington's views on the cruelty of man versus nature. In such circumstances, the quote itself can have only one meaning and that is not defamatory.

The fact that the comment was presented against the backdrop of hunting in Colorado and Utah also does not make it defamatory. As was just noted, this viewpoint has been endorsed by other hunters throughout the country; it does not represent a purely Michigan view. Since his view is widely accepted, it is not reasonable to believe that damage to plaintiff's reputation would occur by merely broadcasting it during a segment on Colorado and Utah.

There is also nothing arising from the scenes which were shown at the time this quote was presented that would deflate its meaning and defame Mr. Washington. The fact that men were loading a dead deer onto a truck does not make it defamatory. It is a necessary part of hunting that the dead animal be removed from the woods so its meat can be butchered and eaten. Loading a deer onto a truck, or car, is a necessary step in this process and as such it cannot be perceived how this scene would so harm the reputation of Mr. Washington as to lower him in the estimation of the community or to cause third persons to keep from associating with him.

### D.

All the plaintiffs have joined in the final count. They state that CBS represented to the viewing public that "The Guns of Autumn" was an accurate presentation of hunting in America. Plaintiffs assert, however, that "The Guns of Autumn" and "The Echoes of 'The Guns of Autumn' " maliciously distorted the truth and presented only the most unfavorable and unpleasant aspects of hunting, portraying practices which are not followed by the vast majority of hunters in Michigan and America. It is alleged that by presenting these programs without editorial comment, it caused the uninformed television viewer to believe that all hunters act this way. In their complaint, plaintiffs state that by doing this, "the defendant violated its duty as news

broadcasters to present the truth as it exists and presenting these programs which portrayed the sport game hunter in a very unfavorable light, damaged these plaintiffs in their reputation."

To this court, it appears that plaintiffs are alleging that the "fairness doctrine" was violated and that defendants acted tortiously by portraying the sport hunter in a false light. It is this court's opinion that both these contentions must be rejected.

### (i)

 The fairness doctrine was established and refined in rulings of the Federal Communications Commission. In its present form, it imposes a two-fold duty on radio and television broadcasters: the broadcaster must give adequate coverage to public issues, and coverage must be fair in that it accurately reflects the opposing views. *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 111, 93 S.Ct., 2080, 2090, 36 L.Ed.2d 772 (1973); *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 377, 89 S.Ct. 1794, 1799, 23 L.Ed.2d 371 (1969). There is no requirement that the opposing views be aired in the same program, or even in the same series; they must simply find a place in the station's overall programming. *Straus Communications, Inc. v. F.C.C.*, 434 U.S.App.D.C. 149, 530 F.2d 1001 (D.C.Cir. 1976). The format and the choice of a spokesman for the competing views are left to the broadcaster's discretion, "subject only to a standard of reasonableness and good faith." *Id., quoting Fairness Report*, 48 F.C.C.2d 1, 8 (1974).

 In the instant case, plaintiffs allege that traditional views on hunting were not portrayed in the two broadcasts. I need not, however, make any judgment on the merits of that claim. The reasoning of the court in *Ahmad v. Levi*, 414 F.Supp. 597, 603 (E.D.Pa.1976) is applicable here:

> Congress has delegated the primary responsibility for enforcing the "fairness doctrine" to the Federal Communications Commission, not the district courts. *See, Columbia Broadcasting System, Inc. v.*

> *Democratic National Committee, supra; Red Lion Broadcasting Co. v. FCC, supra.* Indeed, the Commission is the exclusive primary forum in which alleged violations of the Act may be vindicated. *Post v. Payton*, 323 F.Supp. 799, 802 (E.D.N.Y. 1971); *Ackerman v. Columbia Broadcasting System, Inc.*, 301 F.Supp. 628, 631 (S.D.N.Y.1969); *Gordon v. National Broadcasting Company*, 287 F.Supp. 452, 455 (S.D.N.Y.1968). The instant complaint contains no hint that plaintiffs have applied to the Commission for relief. Accordingly, it must be dismissed against defendant broadcasters for failure to exhaust the federal administrative remedies provided by Congress as part of a comprehensive statutory scheme to regulate the broadcasting industry in the public interest.

### (ii)

"False light" is part of the general tort of "invasion of privacy." Michigan has recognized the right to privacy. *Pallas v. Crowley-Milner & Co.*, 334 Mich. 282, 54 N.W.2d 595 (1952). The Restatement states that the right is invaded when there is:

(a) An unreasonable intrusion of one's seclusion, or

(b) An appropriation of one's name or likeness, or

(c) Unreasonable publicity given to one's private life, or

(d) Publicity which unreasonably places one in a false light before the public.

Restatement (Second) of Torts, § 652A, *supra*.

Plaintiffs' claim is based only on the false light invasion of privacy, item (d) above. The Restatement text writers point out that false light invasion of privacy is a distinct form of tort which is dependent on falsity and thus is closely allied to defamation. In these cases, a plaintiff may have an action which can be laid in libel and slander, or in invasion of privacy. It is not, however, necessary to the action for invasion of privacy that the plaintiff be defamed. Restatement (Second) of Torts, § 652E, comment b.

The problem is whether the plaintiff can, by suing for invasion of privacy, by-pass the various safeguards which have grown up around the tort of defamation. The Restatement indicates that an argument can be made for imposing the restrictions attendant to defamation and, in fact, the Supreme Court has extended to invasion of privacy the constitutional limitations which *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) imposes upon defamation. *Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967). The Restatement states that in determining what other limitations will be extended to false light actions the decision should turn on the nature of the particular restriction and the facts of the case. Restatement (Second) of Torts, § 652E, comment e.

In at least one respect, the torts of defamation and false light are similar. An element of defamation is that the publication be "a false and defamatory statement concerning *another.*" *Id.*, § 558 (emphasis supplied); an element of false light requires that one give "publicity to a matter concerning *another* that places *the other* in a false light." *Id.*, § 652E. (Emphasis supplied.) Each tort is directed toward a particular individual, and in the area of defamation this has given rise to the rule that a publication is not actionable unless it is "of and concerning" the individual plaintiff. *Id.*, §§ 564 and 564A. This court can find no reason why a similar rule should not be extended to claims of false light. This would require that the publicity forming the basis for the false light claim be reasonably capable of being understood as singling out, or pointing to, the plaintiff. This necessarily means that when a group is placed in a false light an individual member of that group cannot maintain a false light claim unless (a) the group or class is so small that the publicity can be reasonably understood as referring to that individual, or (b) the circumstances surrounding the publicity reasonably give rise to the conclusion that there is a particular reference to that individual. *Id.*, § 564A.

In the instant case, plaintiffs' injuries are based on their belief that defendant's broadcasts placed the Michigan sport hunter in a false light. Plaintiffs are thus claiming that by placing the group in a false light each individual member of the group has been injured and can maintain his own false light action.

By plaintiffs' own admission, the group of Michigan sport hunters consists of over a million individuals. This group is not so small that the publicity can be reasonably understood as referring to the plaintiffs. Plaintiffs have also pointed to no circumstances surrounding the broadcasting of the films which would give rise to the conclusion that they were being referred to in the films. Therefore, this court must hold that plaintiffs' claim for false light invasion of privacy is not actionable.

### IV.

This court has reviewed the films in question and examined all the pleadings, including plaintiffs' complaint, brief in opposition to summary judgment, and supporting affidavits. For the reasons set forth above, it must grant defendant's motion for summary judgment and dismiss all counts alleged by plaintiffs.